Darrel Wayne HILL, Appellee/Cross–
Appellant,

v.

A.L. LOCKHART, Director, Arkansas
Department of Correction,
Appellant/Cross–Appellee.

Nos. 93–2894, 93–3159.

United States Court of Appeals,
Eighth Circuit.

Submitted March 17, 1994.

Decided July 5, 1994.

Rehearing and Suggestion for Rehearing
En Banc Denied Aug. 16, 1994.

Olan Warren Reeves, Little Rock, AR, argued (Kelly K. Hill, on the brief), for appellant.

Ray E. Hartenstein, Little Rock, AR, argued, for appellee.

Before McMILLIAN, BOWMAN, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

In February, 1980, in the course of a robbery of a gasoline station in Pencil Bluff, Arkansas, Darrel Wayne Hill kidnapped E.L. Ward, the owner of the service station, and Donald Teague, an officer of the Arkansas Game and Fish Commission who had walked into the service station office during the robbery. Mr. Hill stole money from each man and subsequently shot each man at least twice at close range. Mr. Ward survived, but Mr. Teague died. (We recount these facts as undisputed, since Mr. Hill has not challenged, in the case before us, the sufficiency of the evidence against him.)

In connection with those events, Mr. Hill was charged with six crimes in state court in Arkansas in February, 1980. He pleaded not guilty by reason of insanity. A jury convicted him of all six crimes in July, 1980. Mr. Hill was sentenced to life in prison for the attempted murder of Mr. Ward; he was sentenced to death for the murder of Mr. Teague. He was also sentenced to 50 years in prison for each of the other four crimes—two counts of kidnapping and two counts of robbery.

On direct appeal, the Arkansas Supreme Court vacated the convictions for kidnapping and robbery related to Mr. Teague, holding that they were lesser included offenses of the murder charge. *See Hill v. State*, 275 Ark. 71, 628 S.W.2d 284, 287 (1982), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). On a petition for postconviction relief, the Arkansas Supreme Court vacated the convictions for kidnapping and robbery related to Mr. Ward, holding that they were lesser included offenses of the attempted murder charge. *See Hill v. State*, 278 Ark. 194, 644 S.W.2d 282, 284–85 (1983) (*per curiam*).

In late 1982, Mr. Hill petitioned in federal district court for habeas corpus relief under 28 U.S.C. § 2254. In early 1989, he filed an amended petition (the interim delay occurred by agreement of the parties, pending decisions by the Supreme Court on several cases involving the Arkansas death penalty). Mr.

Hill alleged that he had received ineffective assistance of counsel in several respects in his state court trial; he also contended that the state trial court had erred in denying a motion for change of venue and in allowing the jury to consider certain prior convictions when determining the sentence to be imposed on the murder charge.

In mid–1993, the district court granted Mr. Hill's petition on the grounds that he had received constitutionally significant ineffective assistance of counsel during both the guilt phase and the penalty phase of his state court trial with regard to his extensive history of mental illness, see *Hill v. Lockhart*, 824 F.Supp. 1327, 1343–44 (E.D.Ark.1993), and that the state trial court had erred to a constitutionally significant degree in allowing the jury to consider certain of Mr. Hill's prior convictions for sentencing purposes on the murder charge, see *id.* at 1335–37, 1344. The district court held, however, that Mr. Hill had not been deprived of due process by the state trial court's denial of a motion for change of venue. *See id.* at 1333. Because of its holdings with respect to ineffective assistance of counsel and the use of certain prior convictions, the district court vacated Mr. Hill's convictions and sentences for both the attempted murder of Mr. Ward and the murder of Mr. Teague. *See id.* at 1345. The district court then ordered the state either to retry Mr. Hill on those charges or to release him. *See id.*

The state appeals the district court's rulings on ineffective assistance of counsel and the use of certain prior convictions. Mr. Hill cross-appeals the district court's ruling on the venue motion. We reverse the district court with respect to ineffective assistance of counsel at the guilt phase of Mr. Hill's state court trial. We affirm the district court, however, with respect to ineffective assistance of counsel at the penalty phase of that trial. On Mr. Hill's cross-appeal, we affirm the district court with respect to the venue motion. Because of our holdings, we need not reach the issue involving the use of certain prior convictions in sentencing on the murder charge.

We therefore reinstate Mr. Hill's convictions for both the attempted murder of Mr. Ward and the murder of Mr. Teague. We vacate, however, Mr. Hill's sentences of life in prison for the attempted murder of Mr. Ward and death for the murder of Mr. Teague, and we direct the district court to order the state to retry the question of penalty on both of those charges.

I.

■ The essence of Mr. Hill's claim with respect to ineffective assistance of counsel in his amended petition for habeas relief is that he had a long history of mental illness that should have been more thoroughly investigated before his state court trial and then explored in detail at that trial, both during the guilt phase, to support his defense of insanity, and at the penalty phase, to serve as mitigating circumstances. The state's response to the petition contended that Mr. Hill had failed to present to the state courts the issue of ineffective assistance of counsel at the guilt phase, and therefore that that ground was procedurally defaulted and could not be considered by the federal courts unless Mr. Hill showed cause for his default and prejudice arising from that default. *See, e.g., Wainwright v. Sykes*, 433 U.S. 72, 85, 87, 90–91, 97 S.Ct. 2497, 2508–09, 53 L.Ed.2d 594 (1977); *see also Engle v. Isaac*, 456 U.S. 107, 110, 129, 102 S.Ct. 1558, 1562–63, 1572–73, 71 L.Ed.2d 783 (1982). (The state concedes that Mr. Hill presented the issue of ineffective assistance of counsel at the penalty phase.) On appeal of the district court's rulings, the state argues that Mr. Hill never showed either cause or prejudice for his default on the issue with respect to the guilt phase and therefore that the district court erred in addressing that issue on its merits.

We consider first the question of whether Mr. Hill failed to present to the state courts the issue of ineffective assistance of counsel at the guilt phase of his state court trial. "A federal court may consider the merits of a claim made in a habeas corpus petition if the petitioner has fairly presented to the state courts the substance of his claim." *Guinan v. Armontrout*, 909 F.2d 1224, 1227 (8th Cir. 1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 800, 112 L.Ed.2d 861 (1991). "The same factual arguments and legal theories should

be present in both the state and federal claims." *Kenley v. Armontrout*, 937 F.2d 1298, 1302 (8th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991).

In Mr. Hill's petition for postconviction relief to the Arkansas Supreme Court, he referred to his lawyers' failure to present evidence of his psychiatric hospitalization and subsequent outpatient treatment in Oklahoma just a few months before the events for which he was convicted in state court. Although that reference was in a paragraph focusing primarily on his lawyers' failure to present that evidence during the penalty phase of his state court trial, he does plainly state that the evidence was "relevant [and] admissible ... at both the guilt and penalty phases of the trial" and "could have supported the defense of insanity as well as mitigating circumstances," *i.e.,* "diminished capacity."

"Significantly, the legal analysis to be applied by this court" to Mr. Hill's claim, *i.e.,* ineffective assistance of counsel related to failure to present evidence of an extensive history of mental illness is "the same regardless of which of the discrete aspects" of the state court trial is at issue—the guilt phase or the penalty phase. *Guinan,* 909 F.2d at 1227. "The question of mental condition," moreover, "cannot be neatly divided into sanity at the time of the offense as the relevant issue at the guilt phase, and mitigating evidence as the relevant issue at sentencing.... [A criminal defendant's] intellectual understanding of his actions and their gravity [is] ... clearly in issue at both phases of the proceedings." *Starr v. Lockhart,* 23 F.3d 1280, 1290 n. 7 (8th Cir.1994). The state apparently does not dispute that Mr. Hill presented sufficient facts with respect to ineffective assistance of counsel in general to the Arkansas Supreme Court. The only issue for this court is whether the reference to the guilt phase of Mr. Hill's state court trial in his petition for postconviction relief was "sufficient to fairly apprise the Arkansas Supreme Court" of Mr. Hill's claim with respect to that phase of his state court trial. *Snell v. Lockhart,* 14 F.3d 1289, 1298 (8th Cir.1994).

After careful consideration, we believe that even though Mr. Hill "did not precisely articulate the issue in the state court, ... he fairly presented both the factual and legal bases of the claim" regarding ineffective assistance of counsel at the guilt phase to the state supreme court. *Bannister v. Armontrout,* 4 F.3d 1434, 1440 (8th Cir.1993), *petition for cert. filed* (May 27, 1994). In other words, we believe that the necessary " 'arguable factual commonality,' " *Kenley,* 937 F.2d at 1303, quoting *Laws v. Armontrout,* 863 F.2d 1377, 1387 n. 10 (8th Cir.1988) (*en banc* ), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989), exists between the claims presented by Mr. Hill in the state courts and those stated in his federal petition for habeas relief. *See, e.g., Snell,* 14 F.3d at 1299 ("the brief in this case explicitly cited the due process clause," and the state courts "could easily have recognized that included within the myriad claims of undue prejudice was a claim ... [for] denial of due process"), and *Guinan,* 909 F.2d at 1227 ("[i]n substance the claims ... are obviously closely related"); *see also Eldridge v. Atkins,* 665 F.2d 228, 232 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982) ("the record as it relates to the claim of ineffective counsel cannot be divided piecemeal when the question is whether an individual has been wrongfully convicted"). We therefore hold that Mr. Hill has not defaulted that claim and that the district court was correct to consider the merits of that claim. We turn, then, to an evaluation of the merits of Mr. Hill's claim of ineffective assistance of counsel at both the guilt phase and the penalty phase of his state court trial.

## II.

As noted above, the basis for Mr. Hill's claim of ineffective assistance of counsel is that his lawyers failed to investigate and present his extensive history of mental illness, which could have been used in his state court trial to support his insanity defense during the guilt phase and his offer of mitigating circumstances during the penalty phase. At the time of his arrest on state charges in Arkansas in February, 1980, Mr. Hill had been hospitalized for psychiatric evaluation at least four times—for a week in

early 1968 in Oklahoma; for five months in spring and summer, 1968, in Missouri; for a month in mid–1970 in Oklahoma; and for two and a half months in summer, 1979, in Oklahoma. In addition, the record reflects that he had been placed on a psychiatric ward while in prison at least four times—for a year in the mid–1960s, and for periods of one month, three and a half months, and one month in the early 1970s. Because of the nature of this case, we relate some details of several of those hospitalizations.

Mr. Hill committed himself voluntarily in 1968 to an Oklahoma hospital. He was 27 years old at that time and had been released a month earlier from a term in prison. According to hospital records, both Mr. Hill and his wife stated that he had been diagnosed as a paranoid schizophrenic while in prison. The doctor's notes on the day of admission reflect that Mr. Hill was "anxious, feels unreal, in a dream world, hearing voice of his dead father telling him 'This isn't the answer,' 'you're going to be killed anyway, you should kill yourself.'"

A history taken by two doctors four days after Mr. Hill's admission states that Mr. Hill "believes much of his problems center around the death of his father several years ago . . . [when Mr. Hill] was burglarizing a safe . . . and . . . went after his father to help [him] load [the safe] on a truck. On their return . . . the law was there, [Mr. Hill and his father] turned around and left . . . , the police followed them and found them. . . . The police fired and struck his father, and his father died the next day. The patient himself got away. . . . This man says that he has been hearing voices in his head for several years, . . . mostly they are his father telling him that he is going to be killed, that he will meet some sort of violent death, and that he should kill himself because he is about to die anyway. He had one vision of his father while in prison, also while he was in prison, an inmate was stabbed to death and shortly [there]after this inmate appeared to him . . . and told him that he would die the same way. He believes he had a great number of enemies at the penitentiary, and numbers of the inmates are for various reasons following him and [plotting] to kill him. This or else they

have friends presently outside who are planning to kill him. . . . He can't sleep, feels extremely panicky, extremely anxious, and is constantly afraid that he will be killed. . . . He does not believe his voices are real but they exist only in his imagination, the ideas that his life is in danger he very definitely believes. . . . He . . . feels that people talk about him and laugh at him, feels that many people are planning to kill him."

While at the hospital, Mr. Hill was given anti-psychotic drugs. Within four days, the history taken by the two doctors recounts, he "[said] that he feels better and that his hallucinations have quit." After a week in the hospital, Mr. Hill left without telling anyone. The notes closing his case give diagnoses of "[s]ociopathic personality, antisocial type, with alcoholism and drug addiction" and "[s]chizophrenic reaction, paranoid type."

In mid–1970, when he was 29 years old, Mr. Hill was sent for observation to a second Oklahoma hospital. That admission was by court order for evaluation of his competency; he was facing robbery charges at that time. A psychological evaluation conducted two days after Mr. Hill's admission states that "all in all, the test results indicate both sociopathic tendencies with schizy underpinnings and [that] he has the potential for unpredictable, possibly at times violent behavior." Two staff doctors interviewed Mr. Hill approximately three weeks after his admission to the hospital. Their impression was that Mr. Hill "is not undergoing an acute psychotic episode at this time." Their diagnosis was "[a]ntisocial personality." The hospital released Mr. Hill to the court four days later.

In mid–1979, while facing charges of car theft, Mr. Hill was interviewed in jail in Oklahoma by a psychiatrist at the request of the court. Mr. Hill was 38 years old at that time. The doctor's notes reflect that "[i]n the 1960's the prisoner was in [a hospital in Missouri] for [p]aranoid [s]chizophrenia and was placed on anti-psychotic drugs. During his last imprisonment . . . he spent most of his time in the psychiatric unit until it was burned and then in isolation from the general prison population. He was on [anti-psychotic drugs while in prison]. He quit his drugs after release from prison." The doctor made

a preliminary diagnosis of paranoid schizophrenia and recommended hospitalization "for care and treatment," since "it is felt that [Mr. Hill] cannot properly understand charges currently pending and would have difficulty cooperating with his attorney in his defense."

Four days later, Mr. Hill was admitted by court order to a hospital in Oklahoma. The admission notes state that Mr. Hill "is very delusional with ideas of persecution, the [p]olice want to kill him and they were putting poison on his food while in jail. Admit[s] to hav[ing] auditory hallucinations, talk[s] to his dead father and his father answer[s] to him."

Upon admission, Mr. Hill began a regimen of anti-psychotic drugs. After about a month of hospitalization, according to Mr. Hill's release summary, Mr. Hill's doctor "discontinued all medications to evaluate [Mr. Hill's] behavior. After the medication was discontinued, the patient became psychotic again, therefore, [the doctor] placed him on medication again. He started to improve ... [and continued to improve], and he became friendly and cooperative, socialized well with others, and did not cause any problems on the ward.... His delusions disappeared as well as his auditory hallucinations."

Mr. Hill was released to the court after two and a half months. At discharge, his release summary stated, Mr. Hill was "no longer psychotic, ... in good contact with reality, and his delusions and hallucinations [had] disappeared." His final diagnoses were "[s]chizophrenia, paranoid type," "[a]lcohol addiction," and "[d]rug dependency (LSD, amphetamines, heroin, cocaine, opium, marijuana, and others)."

The notes of Mr. Hill's outpatient treatment in Oklahoma after his release indicate that he was seen monthly from mid-August through mid-December, 1979, and continued to take his anti-psychotic drugs. In mid-January, 1980, however, he failed to keep his scheduled appointment. He was arrested in Arkansas three weeks later—after the robbery of Mr. Ward's service station, the attempted murder of Mr. Ward, and the murder of Mr. Teague.

## III.

"[T]he purpose of the effective assistance guarantee [in the sixth amendment] is ... simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). "The benchmark for judging any claim of [constitutionally significant] ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. The same principle applies to a capital sentencing proceeding." *Id.* at 686, 104 S.Ct. at 2064.

■ A petitioner's claim "that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the [petitioner] must show that counsel's performance was deficient.... Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. at 2071.

■ A reviewing court's task with respect to attorney performance is to "determine whether, in light of all the circumstances, the [lawyer's performance was] outside the range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. "Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir.1993); *see also Eldridge v. Atkins,* 665 F.2d 228, 232 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982).

"The purpose of the ... guarantee of counsel [in the sixth amendment] is to assure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 691–92, 104 S.Ct. at 2067. "The defendant must [therefore] show that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence ... the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069.

In one case, the Supreme Court has intimated very obliquely that even after deficient performance and sufficient prejudice have been shown with respect to an ineffectiveness claim, a reviewing court should then consider an additional harmless-error analysis. *See Lockhart v. Fretwell,* —— U.S. ——, —————— n. 2, 113 S.Ct. 838, 842-43 n. 2, 122 L.Ed.2d 180 (1993) ("[h]armless error analysis is triggered only *after* the reviewing court discovers that [a trial] error [of constitutional magnitude] has been committed.... Since we find no constitutional error, we need not ... consider harmlessness") (emphasis in original). In *Starr v. Lockhart,* 23 F.3d 1280, 1291–92 (8th Cir.1994), the court stated that ineffective assistance claims are trial errors—that is, errors that occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether [the error] was harmless," *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991), rather than errors that amount to "structural defects in the constitution of the trial mechanism" that affect "the framework within which the trial proceeds," *id.* at 310, 111 S.Ct. at 1265.

Under the oblique intimation in *Lockhart v. Fretwell,* then, a reviewing court in a habeas case would, presumably, have to consider whether any constitutionally significant ineffectiveness claim was also harmless under the test enunciated in *Brecht v. Abra-*

*hamson,* —— U.S. ——, ——, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993), for trial errors in habeas cases ("whether the ... error 'had substantial and injurious effect or influence in determining the jury's verdict' "), quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); *see also Brecht,* —— U.S. at ——, 113 S.Ct. at 1722. We have found no cases, however, where a reviewing court actually considered the question of harmless error after finding constitutionally significant ineffective assistance of counsel in a habeas case.

One court has explicitly concluded, moreover, that the prejudice question addressed as part of the ineffective assistance claim is essentially the same inquiry made in a harmless-error analysis. *See Smith v. Dixon,* 14 F.3d 956, 974, 976 (4th Cir.1994) (*en banc*) ("for all of the *same* reasons fully set forth ... [in the part of the opinion] addressing harmless error, [the defendant] is unable to show actual prejudice as a result of his attorney's failure to raise the heinousness claim on direct appeal"; "[i]t would be illogical to hold, on the one hand, that we are able to assess the effect of the error for purposes of deciding prejudice under *Strickland* ... but find that we are unable to evaluate the effect of this error in determining prejudice for purposes of harmless error analysis.... this court must be qualified to assess the prejudicial impact of an unconstitutionally vague instruction on an aggravating factor because we are already required to conduct this *same* type of evaluation in the context of determining prejudice under *Strickland*") (emphasis supplied).

■ We too believe that the prejudice inquiry necessary to determine whether a criminal defendant has received constitutionally significant ineffectiveness of counsel (whether a "probability sufficient to undermine confidence in the outcome" exists "that, but for counsel's unprofessional errors, the result of the proceeding would have been different"), *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, is analogous to the harmless-error analysis applicable to trial errors in habeas cases (whether the error " 'had substantial and injurious effect or influence in determining the jury's verdict' "), *Brecht,* ——

U.S. at ——, 113 S.Ct. at 1714, quoting *Kotteakos*, 328 U.S. at 776, 66 S.Ct. at 1253. Absent more explicit direction from the Supreme Court, therefore, we hold that it is unnecessary to add a separate layer of harmless-error analysis to an evaluation of whether a petitioner in a habeas case has presented a constitutionally significant claim for ineffective assistance of counsel. We turn, then, to an evaluation of the investigation of Mr. Hill's history of mental illness and the presentation of his insanity defense during the guilt phase of his state court trial.

## IV.

The state trial court appointed a lawyer for Mr. Hill on February 13, 1980. About a week later, the lawyer moved for a psychiatric examination of Mr. Hill and gave notice to the state that Mr. Hill might raise insanity as a defense. *See* Ark.Code Ann. § 5–2–304(a). To prevail on an insanity defense, Mr. Hill had to prove, by a preponderance of the evidence, that at the time of the events in question, "as a result of mental disease or defect," he lacked the capacity to "conform his conduct to the requirements of law or to appreciate the criminality of his conduct." *See* Ark.Code Ann. § 5–2–312(a) and Ark. Code Ann. § 5–1–111(d); *see also* AMI Criminal, 4009 (1982). On March 14, Mr. Hill was sent by order of the state trial court for psychiatric evaluation in an Arkansas hospital.

By letter of March 8, Mr. Hill had advised his lawyer of his 1968 hospitalization in Oklahoma, his 1979 hospitalization in Oklahoma, his 1979 outpatient treatment in Oklahoma, and his placements on a psychiatric ward in prison in the mid–1960s and early 1970s. On March 27, Mr. Hill's lawyer wrote to the Arkansas hospital and advised them of Mr. Hill's 1979 hospitalization and outpatient treatment in Oklahoma. The lawyer also related that anti-psychotic drugs had been prescribed for Mr. Hill but that he had quit taking them "for a period of some weeks" before the events for which he was arrested. Mr. Hill's lawyer also told the hospital that Mr. Hill had been diagnosed during his Oklahoma hospitalization as "an acute paranoid schizophrenic."

On April 11, Mr. Hill was released to the court, the Arkansas hospital doctors having diagnosed him as being drug-dependent but without psychosis. On April 17, about a week after Mr. Hill's release, his lawyer moved for a court order to obtain the Arkansas hospital records. When asked, during the evidentiary hearing in federal court on the habeas petition, why he did not also move for a court order to obtain Mr. Hill's medical records from Oklahoma at that time, Mr. Hill's lawyer stated, "I simply have no explanation to give on that. I don't know." He later suggested, however, that he might have been under the impression that Mr. Hill's Oklahoma medical records would be included in the Arkansas hospital materials. On May 1, the Arkansas hospital sent its records to Mr. Hill's lawyer. Those records did not include anything related to Mr. Hill's Oklahoma hospitalizations or outpatient treatment.

The state trial court held a motion hearing on May 22. During that hearing, Mr. Hill's lawyers (the state trial court had appointed an additional lawyer for Mr. Hill sometime between mid-March and mid-April) stated that they had requested Mr. Hill's medical records from Oklahoma but had not received them, said that they were not sure yet if Mr. Hill would raise insanity as a defense, and asked the state trial court to authorize a second psychiatric evaluation of Mr. Hill. The state court, noting that trial was then set for June 9, refused to do so, saying that the grounds were not sufficient at that time but that Mr. Hill's lawyers could renew their request once they received the medical records from Oklahoma. The state trial court then declared that Mr. Hill was competent to stand trial.

Mr. Hill had told his first lawyer as early as March 8 about his 1968 hospitalization, his 1979 hospitalization, and his 1979 outpatient treatment in Oklahoma and about his placements on a psychiatric ward while in prison. The lawyers had received Mr. Hill's records from the Arkansas hospital on May 1 and therefore knew at that time that those records contained nothing about the Oklahoma hospitalizations and outpatient treatment. Nonetheless, and in spite of the lawyers'

representation to the state trial court on May 22 that they had requested Mr. Hill's Oklahoma medical records, they did not actually do so until May 27, only two weeks before the scheduled trial date.

Mr. Hill's lawyers finally received his Oklahoma medical records on June 10. (By that time, the state court had postponed the trial until July 7, but only because one of Mr. Hill's lawyers had been called to active duty in the military for two weeks.) The Oklahoma medical records sent to Mr. Hill's lawyers contained, according to the cover letter accompanying them, the doctor's notes from the interview with Mr. Hill in jail in Oklahoma in 1979, the admission notes for Mr. Hill's hospitalization in Oklahoma in 1979, the release summary from that hospitalization, and the notes from Mr. Hill's outpatient treatment in Oklahoma in 1979, plus the psychological evaluation made at the beginning of Mr. Hill's hospitalization in Oklahoma in 1970 and the staff doctors' notes from their interview with Mr. Hill approximately three weeks later. The records included nothing from Mr. Hill's 1968 hospitalization in Oklahoma. The records that were sent, however, did suggest that Mr. Hill may have been schizophrenic as early as 1970, that he responded to anti-psychotic drugs, and, most importantly, that he regressed to a psychotic state when he quit taking those drugs. The substance of those records is described in more detail in section II of this opinion.

The state court trial was then set for July 7. Although Mr. Hill's first lawyer acknowledged, in the evidentiary hearing in federal court on the habeas petition, that he had obtained in February or March the names of psychiatrists and psychologists whom the defense might consider using, it was not until June 27 that Mr. Hill's lawyers moved again for a second psychiatric evaluation of Mr. Hill to refute the conclusions of the doctors at the Arkansas hospital. On July 4, a clinical psychologist appointed by the state trial court visited Mr. Hill in jail for slightly over an hour.

Mr. Hill's state court trial began on July 7. During the guilt phase of that trial, his lawyers called only the clinical psychologist who had interviewed Mr. Hill in jail. They called

none of the doctors who had examined Mr. Hill during any of his hospitalizations, outpatient treatment, or placements on a psychiatric ward in prison. Nor did they introduce any of Mr. Hill's medical records related to those events, although those records would have been admissible. See Ark.R.Ev. 803(3), 803(4), and 803(6). Nor did they explore, through the clinical psychologist's testimony, the fact that Mr. Hill responded to anti-psychotic drugs or the fact that he regressed to a psychotic state when he stopped taking those drugs.

Mr. Hill's first lawyer stated, during the evidentiary hearing in federal court on the habeas petition, that he had contacted only one or two of the five doctors who were named in Mr. Hill's medical records from Oklahoma. He offered no explanation of why he did not contact the others. When asked why he had not called as witnesses any of the doctors he had contacted after reading Mr. Hill's medical records from Oklahoma, Mr. Hill's first lawyer stated that he had "received a highly negative impression of their potential testimony" and that the testimony "would have been highly defensive in nature," reflecting the doctors' need to, "in a sense, justify letting Mr. Hill out." The lawyer also remarked that "one of them ... was not highly articulate in the English language, and ... would be a terrible witness." When asked, then, why Mr. Hill's medical records from Oklahoma were not introduced through the clinical psychologist who did testify for the defense, Mr. Hill's lawyer could offer no explanation.

In that evidentiary hearing, Mr. Hill's first lawyer also alluded to his reluctance to "plac[e] [Mr. Hill's] criminal record or prison record in front of the jury or [to] open[ ] the door to ... such evidence" through Mr. Hill's medical records from Oklahoma. The lawyer conceded that none of the details of Mr. Hill's criminal history were actually in the records but suggested that the state might have introduced that history in rebuttal in some way. The lawyer also suggested that he had been concerned about "prior bad acts" by Mr. Hill aside from his criminal history. The lawyer acknowledged, however, that none of the instances he cited was con-

tained in Mr. Hill's medical records from Oklahoma.

At that evidentiary hearing, the court accepted as an expert in capital litigation a lawyer with extensive experience in capital cases. That lawyer testified that with "a history of prior hospitalization related ... early on by your client," a lawyer defending that client would "want to get the records" "as soon as possible." He also testified that in cases where a court-ordered psychiatric evaluation was unfavorable to the defense, a defense lawyer would "need to find some expert testimony" to refute the conclusions of the court-ordered evaluation. Neither of those tasks, he suggested, was performed in Mr. Hill's case "until the last minute." The lawyer then stated that he could think of no "proper tactical reason" why Mr. Hill's lawyers would not have introduced the medical records from Oklahoma.

The insanity defense explicitly presented at the state court trial was that Mr. Hill was a paranoid schizophrenic who manifested his illness by being likely to react in an "uncontrolled violent outburst" to a person in uniform. After the state brought out in cross-examination that neither Mr. Ward nor Mr. Teague was wearing a uniform at the time of the events in question, Mr. Hill's lawyers asked the psychologist if a paranoid schizophrenic such as Mr. Hill would be likely to erupt in response to a "symbol of something in authority," namely, the insignia of the Arkansas Game and Fish Commission on the side of Mr. Teague's vehicle. The psychologist said, "Yes, any symbol of authority."

The state offered in rebuttal the psychiatrist who had evaluated Mr. Hill during Mr. Hill's four-week stay at the Arkansas hospital. That psychiatrist testified that he had found Mr. Hill to be "without [p]sychosis" at the time of evaluation. He also stated that his opinion was that "at the time of the alleged offense, Mr. Hill probably had the capacity to conform his actions to the requirements of the law." In response to cross-examination by Mr. Hill's lawyers, the psychiatrist related that once Mr. Hill denied being "crazy" or "sick," "the onus was on him [Mr. Hill] to prove to me that he was schizophrenic." Mr. Hill's lawyers did not explore,

with the psychiatrist, any effect on Mr. Hill of anti-psychotic drugs or of his failure to take such drugs.

■ We consider first whether the performance of Mr. Hill's lawyers was "outside the range of professionally competent assistance," *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984), with respect to the investigation of Mr. Hill's history of mental illness and the presentation of his insanity defense at his state court trial. It is true that Mr. Hill's lawyers did not obtain all of his medical records before trial and that they never introduced the medical records that they did have. Nonetheless, much of the most useful information included in those records was alluded to in the testimony of the clinical psychologist who testified for the defense.

For example, with respect to Mr. Hill's history of mental illness and its specific manifestations in his case, the psychologist stated that he had diagnosed Mr. Hill as a paranoid schizophrenic and described paranoid schizophrenia as a psychosis "characterized by delusions, typically ... delusions of persecution where [the afflicted person] might believe that someone or large numbers of people are out to get them." The psychologist stated that one of the tests that he administered to Mr. Hill "indicate[d] the possibility of acute turmoil, that the person is actively psychotic." Mr. Hill's responses to two other tests suggested "weakening ties with reality" and "forces outside of his control within the personality that tend to be pulling him apart," according to the psychologist. The psychologist also remarked that he had reviewed Mr. Hill's 1970 and 1979 hospital records from Oklahoma and that those records also described Mr. Hill as having a "schizoid personality" and reflected a diagnosis of paranoid schizophrenia.

With respect to whether Mr. Hill was insane at the time of the events in question, the psychologist testified that because Mr. Hill's medical records suggested a history of chronic paranoid schizophrenia, it would be reasonable to "assume that [Mr. Hill] has been to some degree [a] paranoid schizophrenic for a long time," including the period of the events in question. The psychologist

stated that "within [Mr. Hill's] delusional system ... he is unable to appreciate the criminality of his act ... and in that sense he is unable to distinguish right from wrong." The psychologist further stated that "within [Mr. Hill's] delusional system," Mr. Hill "cannot" "conform his conduct to what the law requires" and is "psychotic." Finally, with respect to the effect of anti-psychotic drugs on paranoid schizophrenics, the psychologist noted that "paranoid[ ] [schizophrenics] ... have the characteristic of believing that they are okay and the rest of the world is wrong and so when you put them on medications, they only take them as long as they're under supervision ... and what happens is [that] as soon as they are released from very direct, supervised psychiatric care, they get off their medication and the psychosis comes back again."

In short, although Mr. Hill's lawyers did not present his insanity defense explicitly on the theory that he was insane at the time of the events in question primarily because he had stopped taking anti-psychotic drugs, the psychologist's testimony did cover, either directly or by inference, most of the facts that would be essential to support that theory. Unfortunately, the primary facts not presented were that Mr. Hill himself had a history of positive response to anti-psychotic drugs; that he had been taking anti-psychotic drugs regularly between at least mid-June and mid-December, 1979; that he had responded to them; and that he had missed an outpatient appointment to receive those drugs in mid-January, 1980—about three weeks before the robbery of Mr. Ward's service station, the attempted murder of Mr. Ward, and the murder of Mr. Teague.

It seems to us that the defense of insanity caused by Mr. Hill's failure to continue taking anti-psychotic drugs was an obvious one. Indeed, the letter from Mr. Hill's first lawyer to the Arkansas hospital related the facts that would be relevant to that defense, indicating, to us, that the lawyer found them significant even at that early time. The written report of the clinical psychologist who testified for the defense also comments that "[i]t is clear that [Mr. Hill] does much better on antipsychotic medication, but as is typical with paranoid schizophrenics, will not take that medication unless forced to. Left in an unstructured situation, it is apparent that medication will be discontinued and the probability of a psychotic episode again becomes very high." That report also summarized the episode (contained in the medical records that the psychologist reviewed) in which Mr. Hill "improved on antipsychotic medications and was then discontinued" from those drugs, whereupon he "rapidly became psychotic again" until he "was replaced on the medication" and again improved. The clinical psychologist's written report was dated two days before Mr. Hill's state court trial, yet Mr. Hill's lawyers neither introduced it at the trial nor questioned the clinical psychologist about those parts of it.

It does not appear to us that Mr. Hill's lawyers "consider[ed] viable theories," *Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir.1993), that clearly were available at the time those lawyers were preparing Mr. Hill's insanity defense. *See also Eldridge v. Atkins,* 665 F.2d 228, 232 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982) (" '[i]t is the duty of the lawyer to ... explore all avenues leading to facts relevant to ... degree of guilt' "), quoting American Bar Association Project on Standards for Criminal Justice, *Standards Relating to the Prosecution Function and the Defense Function* § 4.1 (approved draft 1971). The medical records that Mr. Hill's lawyers had, unlike those in several other cases, would have provided considerable substantiation for the presentation of an insanity defense based on Mr. Hill's failure to continue taking antipsychotic drugs. *Compare Whitmore v. Lockhart,* 8 F.3d 614, 617 (8th Cir.1993), *petition for cert. filed* (May 11, 1994), and *Laws v. Armontrout,* 863 F.2d 1377, 1390 (8th Cir.1988) (*en banc*), *cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989). In addition, that theory of defense would have been considerably more believable than the one actually presented—that Mr. Hill erupted in unpredictable and violent response to the insignia of the Arkansas Game and Fish Commission on the side of Mr. Teague's vehicle. The mere offering of the theory with respect to the insignia, we

believe, virtually guaranteed that the jury would discount Mr. Hill's claim of insanity.

It appears to us not only that Mr. Hill's lawyers failed to present a defense that would have been both credible and well documented by Mr. Hill's medical history, but also that the defense that *was* offered was barely believable at best and, even worse, not documented by Mr. Hill's medical history. Under those circumstances, we do not believe that the performance of Mr. Hill's lawyers was within the range of "professionally competent assistance," *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. We turn, then, to the question of whether that deficient performance prejudiced Mr. Hill to the extent that our confidence in the "guilty" verdict is undermined.

When cross-examined by the state, the clinical psychologist who testified for the defense acknowledged that Mr. Hill "was introduced to drugs at an early age" and related Mr. Hill's admission that "the use of alcohol was chronic, every day." The psychologist also stated that Mr. Hill had admitted that on the day of the events in question he was using or abusing drugs and, in fact, that in the period before those events, he "was drinking heavily and shooting dope through Arkansas, Texas and Oklahoma." In closing argument, Mr. Hill's second lawyer repeated the testimony that "during January and February of this year ... [Mr.] Hill was probably using drugs, alcohol." The psychologist also conceded that the results of one of the tests given to Mr. Hill could indicate "[a]nti-social conduct," "[n]ot mental sickness."

The psychiatrist who testified for the state summarized his diagnosis of Mr. Hill as without psychosis but drug-dependent. The psychiatrist related his opinion that Mr. Hill abused heroin, amphetamines, cocaine, and alcohol. In the psychiatrist's written report, which was entered into evidence, barbiturates and morphine were also named as drugs on which Mr. Hill was dependent. In closing argument, the state emphasized the conclusion of both the clinical psychologist who testified for the defense and the psychiatrist who testified for the state that "drugs and alcohol abuse" were a problem for Mr. Hill.

Insanity is an affirmative defense under Arkansas law, *see* Ark.Code Ann. § 5-2-312(a), that must be proved by a preponderance of the evidence, *see* Ark.Code Ann. § 5-1-111(d). *See also* AMI Criminal, 4009 (1982). The prejudice inquiry for the guilt phase of the state court trial at this stage must be, therefore, whether there is a reasonable probability that the jury would have concluded that Mr. Hill had proved his affirmative defense if Mr. Hill's lawyers had elicited the specific facts relative to his previous treatment with anti-psychotic drugs and the likelihood that he stopped taking them sometime within three to seven weeks before the events in question. *See Strickland,* 466 U.S. at 694-95, 104 S.Ct. at 2068-69. If no evidence had been introduced about Mr. Hill's drug and alcohol abuse, this would be an extremely close question, in our view, especially in light of what we consider the undoubted negative effect of presentation of a defense based on Mr. Hill's reaction to the insignia of the Arkansas Game and Fish Commission. With evidence of drug and alcohol abuse, however, we cannot say that we are so uncertain about the reliability and fundamental fairness of the guilt phase of Mr. Hill's state court trial that we must reverse his conviction. *See Lockhart v. Fretwell,* — U.S. —, — - —, 113 S.Ct. 838, 841-44, 122 L.Ed.2d 180 (1993), and *Strickland,* 466 U.S. at 685-88, 691-92, 694-96, 104 S.Ct. at 2063-65, 2066-69, 2068-69. We therefore turn to the same inquiries with respect to the penalty phase of Mr. Hill's state court trial.

### V.

The jury found Mr. Hill guilty on all of the charges. The state trial court then allowed the state and Mr. Hill to present evidence relevant to the penalties that Mr. Hill should receive. At that phase of the trial, Mr. Hill's lawyers called only one witness—a minister who had visited with Mr. Hill for approximately two hours. The minister testified that Mr. Hill's "early family life" was "a definite negative influential factor" and that Mr. Hill had "been brought up under some very adverse kinds of circumstances and instilled with some values for which ... he

[may not be] completely and totally responsible." The minister remarked further that "the fact that no members of his family are here shows that for the most part throughout his life, he has been left to fend for himself and he has been alone." Mr. Hill's lawyers neither called any other witnesses nor introduced any documentary evidence of Mr. Hill's medical history, although Mr. Hill's second lawyer did refer several times during his closing argument to testimony presented during the guilt phase of the trial.

Under Arkansas law at the time of Mr. Hill's state court trial, a jury could impose a sentence of between 50 years and life in prison for attempted murder by a person with four or more previous felony convictions. The jury in Mr. Hill's case imposed a sentence of life in prison for the attempted murder of Mr. Ward.

Under Arkansas law at that time, a jury could impose either life in prison without parole or the death penalty for murder. The death penalty could be imposed only if the jury found unanimously in writing that aggravating circumstances existed beyond a reasonable doubt, that aggravating circumstances outweighed beyond a reasonable doubt all mitigating circumstances that existed, and that aggravating circumstances justified beyond a reasonable doubt a sentence of death. *See* Ark.Code Ann. § 5–4–603(a). The only aggravating circumstances that a jury could consider were those specified by statute. *See* Ark.Code Ann. § 5–4–602(4). A jury could hear, however, "any mitigating circumstances." *See id.*

The relevant statutory aggravating circumstances at the time of Mr. Hill's state court trial were that the defendant had previously committed another felony that either was violent or created a substantial risk of death or serious injury to someone else, that the defendant knowingly created a great risk of death to someone other than the murder victim, and that the murder was committed in order to avoid or prevent arrest. *See* Ark.Code Ann. § 5–4–604(3), § 5–4–604(4), and § 5–4–604(5). In closing argument during the penalty phase of Mr. Hill's state court trial, the state suggested that all three of those aggravating circumstances were

present in Mr. Hill's case, and the jury so found.

Relevant mitigating circumstances that a jury could consider included, but were not limited to, that the murder was committed while the defendant was under extreme mental or emotional disturbance, that the murder was committed while the defendant was acting under unusual pressures or influences, and that the murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse. *See* Ark. Code Ann. § 5–4–605(1), § 5–4–605(2), and § 5–4–605(3). In closing argument for the defense, Mr. Hill's second lawyer suggested that all three of those mitigating circumstances were present in Mr. Hill's case, especially the third one. The jury found that no mitigating circumstances were present. The jury then sentenced Mr. Hill to death for the murder of Mr. Teague.

Since the most important issue relative to the penalties imposed on Mr. Hill is whether the jury's choice of the death penalty for the murder of Mr. Teague may have been made because Mr. Hill received constitutionally significant ineffective assistance at the penalty phase of his state court trial, we address that question specifically. All of the same considerations apply, of course, to the jury's choice of life in prison for the attempted murder of Mr. Ward.

■ We consider first whether, at the penalty phase of Mr. Hill's state court trial, the performance of his lawyers was deficient. "The basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the state, and to present mitigating evidence." *Starr v. Lockhart*, 23 F.3d 1280, 1285 (8th Cir.1994). "Evidence of ... emotional disturbance is typically introduced by defendants in mitigation." *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982); *see also Pickens v. Lockhart*, 714 F.2d 1455, 1466 (8th Cir.1983) ("[t]here is no dispute that evidence of ... emotional instability may be relevant in mitigation").

At least three months before the first scheduled trial date, Mr. Hill had told his first lawyer of his 1968 hospitalization in Oklahoma. The 1970 psychological evaluation, which Mr. Hill's lawyers received about a month before the second scheduled trial date, also referred at least twice to that earlier hospitalization. Yet at no time, as far as we can tell, did Mr. Hill's lawyers try to obtain those 1968 medical records.

"Given the severity of the potential sentence and the reality that the life of [the defendant] was at stake," *Pickens,* 714 F.2d at 1467, we believe that it was the duty of Mr. Hill's lawyers to collect as much information as possible about Mr. Hill for use at the penalty phase of his state court trial. Their failure to obtain the records of Mr. Hill's earliest hospitalization does not seem to have been a tactical decision but, rather, because "counsel, as a result of inadequate preparation, had failed to discover the evidence," *Laws v. Armontrout,* 863 F.2d 1377, 1385 (8th Cir.1988) *(en banc ), cert. denied,* 490 U.S. 1040, 109 S.Ct. 1944, 104 L.Ed.2d 415 (1989); *see also Kenley v. Armontrout,* 937 F.2d 1298, 1307 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 431, 116 L.Ed.2d 450 (1991) ("[n]one of the information we have discussed was hidden from counsel. References were made to it or it was brought to his attention in the course of his review of materials and his representation of [the defendant]"), and *Eldridge v. Atkins,* 665 F.2d 228, 237 n. 5 (8th Cir.1981), *cert. denied,* 456 U.S. 910, 102 S.Ct. 1760, 72 L.Ed.2d 168 (1982) ("[c]ounsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial preparation. ... although it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it").

Those 1968 records, it turns out, contain the first account of Mr. Hill's positive response to anti-psychotic drugs. When Mr. Hill admitted himself voluntarily to the hospital in 1968, the doctor's notes from that day reflect, Mr. Hill was "very frightened," was "hearing [the] voice of his dead father," and felt "unreal" and "in a dream world." Four days later, according to a history taken at that time, after having taken anti-psychotic drugs since his admission, Mr. Hill said "that he feels better and that his hallucinations have quit."

We have already concluded that the performance of Mr. Hill's lawyers at the guilt phase of his state court trial was deficient on account of their failure to present evidence of his history on anti-psychotic drugs and the likelihood that he had stopped taking them sometime within three to seven weeks before the events in question. That failure at the penalty phase of Mr. Hill's state court trial was exacerbated by the failure to obtain evidence related to Mr. Hill's first hospitalization, which contained an account of his early positive response to anti-psychotic drugs. We hold, therefore, that the performance of Mr. Hill's lawyers during the penalty phase of his trial was outside the range of "professionally competent assistance," *Strickland v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).

We must turn, then, to the question of prejudice. The initial prejudice inquiry for the penalty phase of Mr. Hill's state court trial must be whether there is a reasonable probability that the jury would have concluded that at least one mitigating circumstance was present if Mr. Hill's lawyers had presented specific information about his history on anti-psychotic drugs and the likelihood that he had stopped taking them at a relevant time, *see* Ark.Code Ann. § 5–4–605. To put it another way, we ask whether Mr. Hill's lawyers' failure to present that information undermines our confidence in the jury's determination that there were no mitigating circumstances. *See Strickland,* 466 U.S. at 694–96, 104 S.Ct. at 2068–69.

Even if the jury decided that Mr. Hill had not proved that he was insane at the time the crimes were committed, evidence with respect to the effect of his failure to take anti-psychotic drugs would have been critical in attempting to show the mitigating circumstances either of extreme mental or emotional disturbance, or of impaired capacity, caused by mental disease or defect, to appreciate the wrongfulness of his acts or to conform his conduct to the requirements of law.

The evidence with respect to Mr. Hill's history of positive response to anti-psychotic drugs, and, even more importantly, of his regression to a psychotic state when he stopped taking those drugs, was not only the most substantial evidence that existed with respect to the likelihood that he was suffering from long-standing and extensive mental problems at the time of the events in question but also vastly more credible than the theory that Mr. Hill exploded at the sight of the insignia of the Arkansas Game and Fish Commission. Yet the jury had no opportunity to consider that evidence.

A clinical psychologist testified as an expert at the evidentiary hearing in federal court on the habeas petition. He concluded that the evidence related to Mr. Hill's deterioration when he stopped taking anti-psychotic drugs was "significant as far as [the] time sequence with the date of the occurrence" of the crime—that the records of Mr. Hill's history in that respect demonstrated "a strong likelihood" that Mr. Hill was psychotic at that time.

The lawyer testifying as an expert in capital litigation at that hearing stated that in his experience, "in the cases where I could explain to the jury why a crime occurred . . . they were more willing to impose a sentence of life imprisonment than in situations where I could not give any explanation for what happened and they thought the defendant was just mean." That lawyer further stated that the evidence related to Mr. Hill's deterioration when he stopped taking anti-psychotic drugs would have "help[ed] explain an emotional disturbance at the time"—"that at the time of the offense there were other external factors affecting [Mr. Hill's] behavior, which is why the . . . murder occurred."

"Given the sympathetic light in which [the defendant's] past behavior could have been presented, . . . given the significant evidence of medically significant conditions and disorders, . . . and the prospects of successful treatment," *Kenley*, 937 F.2d at 1309, we can hardly imagine that Mr. Hill was not prejudiced by his lawyers' default. We believe, in fact, that a reasonable probability does exist that the jury would have found the existence of at least one, and possibly two, mitigating circumstances if Mr. Hill's lawyers had presented evidence with respect to his history on anti-psychotic drugs and his regression to a psychotic state when he stopped taking those drugs. In other words, that failure by Mr. Hill's lawyers has shaken our confidence in the jury's determination that no mitigating circumstances existed. *See, e.g., Lockhart v. Fretwell*, —— U.S. ——, ——–——, 113 S.Ct. 838, 841–44, 122 L.Ed.2d 180 (1993), and *Strickland*, 466 U.S. at 685–88, 691–92, 694–96, 104 S.Ct. at 2063–65, 2066–67, 2068–69; *see also Kenley*, 937 F.2d at 1308–09.

We must consider also, however, whether there is a reasonable probability that, if the jury had found the existence of at least one mitigating circumstance, the jury would have failed to find that the aggravating circumstances of the crime outweighed beyond a reasonable doubt all of the mitigating circumstances found. *See* Ark.Code Ann. § 5–4–603(a)(2). This is a most troubling question, because "[t]he weighing process is not simply a matter of counting the number of aggravating and mitigating circumstances and striking a balance. It is a reasoned judgment to be exercised in the light of the totality of the circumstances." *Giles v. State*, 261 Ark. 413, 549 S.W.2d 479, 485 (1977) (*en banc*), *cert. denied*, 434 U.S. 894, 98 S.Ct. 272, 54 L.Ed.2d 180 (1977).

Our mistrust of the jury's finding with respect to the existence of mitigating circumstances makes us correspondingly unwilling to declare that, if the jury had found at least one mitigating circumstance, it would have found, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances. In other words, we believe that a reasonable probability does exist, if the jury had found the evidence in question credible enough to establish at least one mitigating circumstance, that the jury would have decided that the aggravating circumstances did *not* outweigh the mitigating circumstances to the degree of certainty required—that is, beyond a reasonable doubt, *see* Ark.Code Ann. § 5–4–603(a)(2). For the same reasons, we believe that there is a reasonable probability, even if the jury had found beyond a reasonable doubt that the aggravating circumstances outweighed the

mitigating circumstances, that the jury would have decided that the aggravating circumstances did not justify, beyond a reasonable doubt, a sentence of death, *see* Ark.Code Ann. § 5–4–603(a)(3). *See, e.g., Williams v. State,* 274 Ark. 9, 621 S.W.2d 686, 688 (1981), *cert. denied,* 459 U.S. 1042, 103 S.Ct. 460, 74 L.Ed.2d 611 (1982); *see also Pickens v. State,* 292 Ark. 362, 730 S.W.2d 230, 236 (1987), *cert. denied,* 484 U.S. 917, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), and *Clines v. State,* 280 Ark. 77, 656 S.W.2d 684, 686 (1983), *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1984).

In short, we find that because Mr. Hill's lawyers failed to present evidence with respect to his history on anti-psychotic drugs and his regression to a psychotic state when he stopped taking those drugs, the penalty phase of his state court trial was rendered fundamentally unfair. *See Lockhart v. Fretwell,* —— U.S. at —— – ——, 113 S.Ct. at 841–44, and *Strickland,* 466 U.S. at 685–88, 691–92, 694–96, 104 S.Ct. at 2063–65, 2066–67, 2068–69; *see also Kenley,* 937 F.2d at 1308–09. For the same reasons, our confidence is undermined in the jury's conclusion that Mr. Hill should receive life in prison, rather than a set term of 50 or more years, for the attempted murder of Mr. Ward. We therefore vacate both of those sentences and remand the case to the district court. We direct the district court to order the state to retry the question of penalty for the murder of Mr. Teague and the attempted murder of Mr. Ward. (Mr. Hill apparently does not challenge the jury's finding, with respect to the attempted murder charge, that he had committed four or more prior felonies. We note, accordingly, that on retrial of the penalty to be imposed for that charge, Mr. Hill is bound by that finding.)

## VI.

■ Because we have not vacated Mr. Hill's convictions, we address briefly his argument on cross-appeal with respect to the motion for change of venue. Mr. Hill contends, first, that the venire as a whole in his state court trial was prejudiced by pretrial publicity. Mr. Hill also argues that the district court improperly failed to conduct an independent review of the venue and *voir dire* proceedings from his state court trial. Finally, Mr. Hill argues that the state trial court never made an explicit finding that an impartial jury could be selected from the venire.

It is true that the Supreme Court has stated that it is "the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the empaneled jurors" when a habeas petitioner alleges an improper denial of a motion to change venue. *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). In that same case, however, the Supreme Court also noted that "findings of impartiality should be set aside only where prejudice is 'manifest.'" *Id.* at 724, 81 S.Ct. at 1643, quoting *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878).

In its opinion denying habeas relief with respect to venue, the district court described specific testimony presented on the venue issue and specific *voir dire* questions and answers from the members of the venire; the district court also referred several times to "the record." *See Hill v. Lockhart,* 824 F.Supp. 1327, 1331–33, 1332 n. 3 (E.D.Ark. 1993). It is obvious to us that the district court did conduct an independent review of the venue and *voir dire* proceedings from Mr. Hill's state court trial. It is also self-evident that the state trial court found, implicitly, that an impartial jury could be selected when that court directed the clerk to swear in the jurors finally chosen.

"In habeas proceedings, the determination by the trial judge that jurors are qualified is subject to a presumption of correctness.... This is so because the issue is essentially one of credibility, where the demeanor of the prospective juror becomes relevant.... Therefore, so long as there is fair support in the record for the state court's conclusions regarding the jurors' impartiality, those conclusions should not be overturned in habeas proceedings." *Snell v. Lockhart,* 14 F.3d 1289, 1294 (8th Cir.1994), citing 28 U.S.C. § 2254(d)(8); *see also Simmons v. Lockhart,* 814 F.2d 504, 511 (8th Cir.1987), *cert. denied,* 485 U.S. 1015, 108 S.Ct. 1489, 99 L.Ed.2d 717 (1988) ("[a] state finding of the impartiality of

848

the jury as a whole is to be overturned only if, upon an examination of the whole record, the federal court is convinced that error is manifest"). *See also Patton v. Yount,* 467 U.S. 1025, 1031–32 n. 7, 104 S.Ct. 2885, 2889 n. 7, 81 L.Ed.2d 847 (1984) ("[i]t may be that there is little practical difference between the *Irvin* 'manifest error' standard and the 'fairly supported by the record' standard of the ... habeas statute.... In any case, we do not think the habeas standard is any less stringent").

We too have read the transcript of the venue and *voir dire* proceedings in the state court trial. The state trial court's conclusion that an impartial jury could be chosen is fairly supported by the record; in other words, we see no manifest error in the state trial court's actions in that regard.

 Mr. Hill also argues, however, that six of the individual jurors actually chosen were not impartial. In "a federal habeas corpus case in which the partiality of an individual juror is placed in issue," the question "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed?" *Patton,* 467 U.S. at 1036, 104 S.Ct. at 2891. "Since identifying bias in an individual juror is as much a matter of assessing demeanor as it is of analyzing the answers which the juror gives to questions, ... the findings of the trial court are entitled to particular deference" in such inquiries. *Simmons,* 814 F.2d at 511.

We have read and reread the transcript of the *voir dire* of the six jurors to whom Mr. Hill objects. We believe that the state trial court's conclusion that each could serve as an "impartial, 'indifferent' juror[ ]," *Irvin,* 366 U.S. at 722, 81 S.Ct. at 1642, is fairly supported by the record. In other words, we believe that there was no manifest error in that conclusion by the state trial court.

## VII.

For the reasons stated, we reinstate Mr. Hill's convictions for both the attempted murder of Mr. Ward and the murder of Mr.

Teague. We vacate Mr. Hill's sentences on those convictions and direct the district court to order the state to retry the question of penalty on those charges.