# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 96-3609

_____

| | | |
|---|---|---|
| Stanley D. Lingar, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Michael Bowersox, | * | Appeal from the United States |
| | * | District Court for the Eastern |
| Appellee, | * | District of Missouri. |
| _____ | * | |
| | * | |
| The American Civil Liberties Union | * | |
| Foundation; American Civil Liberties | * | |
| Union, of Eastern Missouri, | * | |
| | * | |
| Amicus Curiae. | * | |

_____

Submitted:  December 16, 1998
Filed: May 11, 1999

_____

Before FAGG, HEANEY, and WOLLMAN, Circuit Judges.

_____

FAGG, Circuit Judge.

Stanley D. Lingar, a Missouri death row inmate, appeals the district court's denial of his petition for writ of habeas corpus. See 28 U.S.C. § 2254 (1994). We affirm.

On the evening of January 5, 1985, Lingar, who was 22, and a friend, eighteen-year-old David Smith, were drinking and driving around Doniphan, Missouri. After stopping at the home of Smith's girlfriend, the two men came upon a group of hitchhiking teens and picked them up. About a mile down a rural highway, they saw a Jeep with its hood up parked on the side of the road. Lingar stopped and the Jeep's driver, sixteen-year-old Scott Allen, told them he had run out of gas. Lingar offered to take Allen back into town to a gas station. Allen got into Lingar's car with Lingar and Smith, and the hitchhikers waited at the Jeep for their return. They never came back.

All of the gas stations in Doniphan were closed. Lingar drove out of town and told Allen to take off his winter coat. Allen initially refused, but complied after Lingar threatened not to give him a ride back to Doniphan. Lingar then stopped the car and told Allen to remove the rest of his clothing. Once Allen was naked, Lingar ordered him to masturbate. Allen tried, but was too frightened. Lingar started the car and drove to his parent's house, where he retrieved a Winchester .22 rifle. Lingar got back in the car, pointed the gun at Allen, and said, "Now I'll bet you're going to do what I say without arguing." Lingar drove back to a rural area, stopped the car, and again told Allen to masturbate. Allen asked permission to urinate. The three got out of the car, and as Allen stood urinating, Lingar shot him. Allen fell to his knees, but pulled himself into the car, got behind the wheel, and turned the key in the ignition. The car lurched and died because Allen did not push in the clutch. Lingar then shot Allen in the head and he fell out of the open driver's side door. Lingar walked over to Allen and shot him two more times. Seeing Allen was still alive, Lingar opened the trunk,

grabbed a tire iron, and hit Allen with it. As Lingar and Smith got back in the car to leave, Allen struggled up onto his hands and knees in front of the car. Complaining, "He's still not dead," Lingar backed up the car, drove forward and hit Allen, then sped away.

Lingar and Smith went to see Lingar's brother, who advised them to dispose of the body and cover the bloody snow. Lingar and Smith returned to the scene of the killing, put Allen's body in the car's trunk, kicked some clean snow over the bloody snow, drove to a swift river, and threw the dead boy into the icy water. They returned to Lingar's parent's house and cleaned up the car. After pawning the car to a salvage dealer, Lingar and Smith left the state and disposed of the rifle on a country road in Kentucky. At the request of authorities, Lingar and Smith returned to Doniphan several days later. They gave statements to the police, who recovered the gun, the car, and Allen's body. Lingar and Smith were charged with first-degree murder. In exchange for Smith's testimony at Lingar's trial, the State dropped the first-degree murder charge against Smith. Smith later pleaded guilty to second-degree murder and was sentenced to ten years in prison.

At Lingar's trial for the capital murder of Allen, the State called many witnesses to establish Lingar's guilt. Two of the hitchhikers testified about Lingar and Smith picking up Allen on the night of his death. A gun expert established the bullets found in Allen were fired from a Winchester .22 and could have been fired from Lingar's rifle. A blood expert testified blood stains in Lingar's car could have come from Allen. Smith explained what had happened, including that Lingar made Allen disrobe and masturbate, shot him four times, beat him with a tire iron, and rammed him with his car. Smith also testified that in the six to eight hours before the murder, Lingar drank thirty cans of beer, a quart of beer, and a half bottle of wine. The defense called a single witness, one of the hitchhikers, who testified Lingar was "wasted" on the night of the killing. On cross-examination, the State tried to elicit more testimony that Lingar, not

Smith, was in charge. The hitchhiker said Lingar had done most of the talking that night.

In closing, the State argued Lingar's actions in stopping for the gun and shooting Allen multiple times showed Lingar had deliberated, and thus committed first-degree murder. The defense argued that although Lingar's intoxication was not a defense, it bore on whether Lingar could deliberate, and he was too drunk to do so. Defense counsel also pointed out Smith's deal with the State gave him an incentive to say Lingar had killed Allen. The jury found Lingar guilty of first-degree murder. After penalty-phase proceedings, the jury recommended the death penalty.

The trial court followed the jury's recommendation and sentenced Lingar to death. Lingar appealed, and the Missouri Supreme Court affirmed Lingar's conviction and sentence. See State v. Lingar, 726 S.W.2d 728 (Mo. 1987). The United States Supreme Court denied certiorari. See 484 U.S. 872 (1987). In 1987, Lingar filed a pro se motion for postconviction relief under Missouri Rule of Criminal Procedure 27.26, and counsel filed an amended Rule 27.26 motion in 1988. After an evidentiary hearing, the state circuit court denied both motions, and the Missouri Supreme Court rejected Lingar's appeal of the denial. See Lingar v. State, 766 S.W.2d 640 (Mo.), cert. denied, 493 U.S. 900 (1989). Lingar then filed a premature pro se federal habeas petition in 1989. After he was appointed counsel, Lingar filed a habeas petition under Missouri Supreme Court Rule 91, which the Missouri Supreme Court denied. Lingar next filed a motion to recall the mandate, which was summarily denied. Lingar then filed this federal habeas petition.

Lingar first asserts the penalty-phase admission of testimony that he is homosexual violated his Eighth and Fourteenth Amendment rights. During his opening argument in the penalty phase, the prosecutor said:

> [T]he main portion of the evidence which we will rely on . . . will simply be the evidence you've already heard in the first stage of the trial. You

will be told that you can consider the facts of the homicide in determining whether or not death is the appropriate punishment. The only evidence we'll have to offer you at this stage, we'll recall David Smith, who will basically tell you that . . . from . . . April of 1984 until the time of this homicide[,] there was a homosexual relationship that existed between [him and Lingar]. You will also hear [about] correspondence between the two of them while these charges were pending . . . , which I think will show you . . . the lack of remorse that Mr. Lingar has for what happened on . . . [the date of the crime].

Trial Trans. at 395. At the bench, Lingar's attorney asked the court to prohibit the state from introducing any evidence of a homosexual relationship because the evidence was irrelevant, immaterial, highly prejudicial, and inflammatory. The State responded that the evidence was relevant because it showed one of the circumstances of the crime and an aspect of Lingar's character. The State also argued keeping Lingar's homosexuality secret was a motive for killing Scott Allen and was a reason Lingar and Smith did "what they did to Scott Allen." Defense counsel replied that motive was not an issue and the evidence would have no purpose other than to turn the jury against Lingar because of his sexual preference, if he was in fact homosexual. Lingar's attorney told the court he had no knowledge of the relationship or of Lingar's homosexuality. The trial court overruled Lingar's objection, stating the evidence was relevant given the facts of the crime.

Smith was the State's only witness during the penalty phase. In responses to three questions, Smith testified he had a consensual homosexual relationship with Lingar from April 1984 up to the time of the crime. See Trial Trans. at 403. The prosecutor did not ask whether the relationship was a secret or whether others knew Lingar was homosexual. The State then asked Smith about a letter he had received from Lingar in prison, and introduced the letter as evidence. In defense, Lingar's attorney called three witnesses. Lingar's father, sister, and mother testified Lingar had never been in trouble before, he was helpful to others, he was not a good student, and he was a good son and brother.

-5-

In closing arguments, the State did not mention Lingar's homosexuality, but argued the existence of two aggravating circumstances--that the murder was outrageously wanton, vile, and horrible, and that the murder happened during a kidnaping. The State urged the jury to hold Lingar accountable for his actions and to impose the death penalty as justice required. In defense, Lingar's attorney pointed out the existence of some mitigating circumstances--that Lingar had no prior criminal history, that Lingar's capacity to appreciate the criminality of his conduct was substantially impaired by alcohol, that Lingar was young when the murder occurred, and that Lingar had been helpful and loving to his family and others before the time of the crime. See Trial Trans. at 438.

Lingar asserts admission of the homosexuality evidence violated his constitutional rights in several respects. Lingar contends his Eighth Amendment rights were violated because the homosexuality evidence was irrelevant and injected arbitrary and capricious factors into the sentencing equation, and because the sentencing decision was based on aggravating evidence that was irrelevant and implicated constitutionally protected conduct. Lingar also asserts his Fourteenth Amendment rights to procedural and substantive due process were violated in several ways. Because the State failed to disclose the evidence before trial, Lingar's attorney did not have a chance to explain or rebut the evidence or to voir dire the jury on their attitudes towards homosexuality. Further, Lingar says the Missouri Supreme Court did not evenhandedly enforce its evidentiary rules by allowing the evidence to withstand scrutiny on direct appeal. Also, Lingar contends admission of the evidence was so inherently prejudicial that it infected the proceedings with unfairness. Finally, Lingar asserts the prosecution's use of constitutionally protected evidence of his private personal sexual habits shocks the conscience. Before this appeal, Lingar argued only that admission of the evidence violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to procedural due process. Nevertheless, our disposition of the preserved claims applies to the new theories too.

Even if admission of the homosexuality evidence during the penalty phase was unconstitutional, Lingar is not entitled to habeas relief unless the error harmed him. See Calderon v. Coleman, 119 S. Ct. 500, 503 (1998). Although the Missouri Supreme Court held the evidence was admissible and thus did not consider whether the admission was harmless, we can consider whether the alleged error was harmless beyond a reasonable doubt on collateral review. See Sidebottom v. Delo, 46 F.3d 744, 756 (8th Cir. 1995); see also Olesen v. Class, 164 F.3d 1096, 1100 (8th Cir. 1999) (harmless error standards); Beets v. Iowa Dept. of Corrections Servs., 164 F.3d 1131, 1134 n.3 (8th Cir. 1999) (same). To decide whether admission of the challenged evidence is harmless, we consider whether the sentencer actually decided to impose the death penalty based on the valid evidence and the constitutional aggravating factors, independently of the challenged evidence or factor. See Sidebottom, 46 F.3d at 756. In other words, we must ask whether there is a reasonable probability that the homosexuality evidence might have contributed to Lingar's death sentence. See Olesen, 1999 WL 927 at *4.

Under the circumstances, we conclude admission of the evidence was harmless. Smith's testimony was quite brief, and the State did not refer to Lingar's homosexuality during closing argument. Lingar contends the State invited the jury to find the "depravity of mind" aggravating circumstance based on his homosexuality. The State did no such thing. One of the aggravating circumstances presented in the jury instructions was that "the murder of . . . Allen involved torture or depravity of mind and that as a result thereof it was outrageously or wantonly vile, horrible or inhuman." In his closing, however, the prosecutor did not mention depravity of mind. He referred only to the instruction "talking about the murder of Scott Allen being outrageously wanton, vile and horrible," and argued, "I don't think there's any question [that] the way Scott Allen died meets that definition." The jury found the aggravating circumstance existed, and we think it is clear that admission of the evidence about Lingar's homosexuality did not contribute to the jury's finding. Lingar does not challenge the other aggravating circumstance, that the murder was committed while

Lingar was engaged in kidnaping. Given the appalling facts of the crime, which alone established the two aggravating circumstances, and the absence of compelling mitigating circumstances, it is clear beyond a reasonable doubt that admission of the evidence did not contribute to the jury's death verdict.

Lingar also asserts his trial counsel's assistance was constitutionally deficient in several ways. To prevail on an ineffective assistance claim, Lingar must show his counsel's performance was deficient and the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687 (1984). When reviewing counsel's performance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. To win, Lingar "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id.

Lingar challenges his trial attorney's decision to concede Lingar was guilty of second degree murder and to rely on the defense of voluntary intoxication to rebut the deliberation element of first-degree murder. Trial counsel and Lingar decided to pursue a second-degree murder conviction to avoid a potential death sentence, but did not expressly discuss conceding second-degree murder. See 27.26 Trans. at 19-20, 53, 55. Thus, during his closing argument in the guilt phase, Lingar's attorney argued Lingar had not committed first-degree murder because he was too intoxicated to deliberate. Defense counsel also said:

> Now, I have tried a number of criminal cases and it is not my habit to get up in front of the jury and make any impassioned plea or try to misquote the evidence or anything of that nature. In this particular instance, Stanley Lingar has committed the acts contained in the instruction for second degree murder. I'll admit that. Because I think that if I tried to argue to you that he's not guilty of second degree murder, I'm not going to have much credibility with you. It's very difficult for a defense attorney to admit any type of guilt on behalf of his client. I think in a case of this

-8-

serious nature, where the State is talking about taking the life of Stan Lingar, that it is my duty to disclose that to you.

Trial Trans. at 383-84.

Lingar contends this strategy was unreasonable because voluntary intoxication was not a legally valid defense to first-degree murder. Lingar's intoxication was presented to the jury as a reason not to find deliberation, however, and the jury rejected it. Like the Missouri Supreme Court, see 766 S.W.2d at 641, we conclude the decision to concede guilt of the lesser charge of second-degree murder was a reasonable tactical retreat rather than a complete surrender. See Bell v. Evatt, 72 F.3d 421, 428 (4th Cir. 1995); United States v. Simone, 931 F.2d 1186, 1196 (7th Cir. 1991). The tactic did not preclude Lingar from maintaining his innocence on the first-degree murder charge, and if successful, would have permitted Lingar to avoid the death penalty. See Bell, 72 F.3d at 429. Further, counsel could retain some credibility and gain an advantage by winning the jury's trust. See id. at 428; Underwood v. Clark, 939 F.2d 473, 474 (7th Cir. 1991). Even if the jury convicted Lingar of first-degree murder, the jury might then be more sympathetic to defense witnesses testifying in the penalty phase that Lingar deserved mercy. See Bell, 72 F.3d at 428. Given the overwhelming evidence, Lingar could not credibly deny involvement in Allen's killing, and denying all involvement could inflame the jury and incite it to render a death sentence. See id. Defense counsel had no viable option. There was no factual basis for a diminished capacity defense or a defense that Smith was the killer. Despite Lingar's assertion, it was not necessary that he expressly consent to the concession. See Underwood, 939 F.2d at 474. Because counsel's concession was a reasonable trial strategy, the concession was not deficient performance.

Lingar also contends his attorney did not know a capital defendant is entitled to introduce any relevant mitigating evidence proffered in support of a sentence less than death, see Lockett v. Ohio, 438 U.S. 586, 604 (1978) (plurality), and thus, his attorney

did not present available nonstatutory mitigating circumstances. According to Lingar, during penalty-phase closing arguments, his attorney told the jury it could not consider nonstatutory mitigating factors. Lingar contends his attorney's erroneous belief that he could not present nonstatutory mitigating evidence prevented him from more thoroughly investigating such evidence.

Contrary to Lingar's selective quotation from defense counsel's closing argument, the record shows Lingar's trial attorney knew he could present nonstatutory mitigating evidence and did so. Indeed, both Lingar's trial attorney and the written instructions told the jury it could consider nonstatutory mitigating evidence. The mitigating circumstances instruction said:

> If you decide that one or more sufficient aggravating circumstances exist to warrant the imposition of death . . . you must then determine whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances so found to exist. In deciding that question, you may consider . . .
> 1. Whether the defendant has no significant history of prior criminal activity.
> 2. Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired.
> 3. The age of the defendant at the time of the offense.
> You may also consider any circumstances which you find from the evidence in mitigation of punishment.

Lingar's attorney explained the instruction in his closing argument. He said:

> The jury instructions tell you . . . in order to consider death, you must find what is called an aggravating circumstance. But even if [you do], [you must then decide whether there are] any mitigating circumstances. And by mitigating circumstances, . . . the defendant is limited to what the statutory mitigating circumstances are. We may have other mitigating circumstances but they are not involved in the statute and we're not allowed to present them. In Instruction No. 17 there is a list of the mitigating circumstances that we believe the evidence justifies. One is

-10-

that there is no prior criminal history of this defendant. . . . Two is whether the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired [by alcohol]. . . . [This] is a mitigating circumstance provided by the law. . . . These are things that are set out in the statute. Number three, the law says that you can consider the age of the defendant at the time the crime was committed. . . . The instruction also says that you can consider other evidence. What other evidence is there to consider in either sparing or taking the life of Stanley Lingar. I think there was evidence [from] the defendant's mother and father and sister [about] what kind of an individual Stanley Lingar was up until [the night of the crime]. I think that you all can remember that testimony and I hope that you'll consider that when you make your determination as to whether or not to take the life or spare a life.

Trial Trans. at 437-39. In context, Lingar's attorney told the jury that although only the statutory mitigating circumstances were specifically listed in the jury instruction, the jury could consider other unlisted mitigating evidence like the testimony of Lingar's family. Counsel's argument makes clear that the jury can consider circumstances that are not enumerated in the instruction, and counsel asked the jury to do so.

Even if counsel misstated the law rather than clumsily explained it, the misstatement did not harm Lingar. When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence. See Griffin v. Delo, 33 F.3d 895, 906 (8th Cir. 1994) (prosecutor's erroneous definition of reasonable doubt in closing arguments was harmless where correctly defined in jury instructions); Girtman v. Lockhart, 942 F.2d 468, 474 (8th Cir. 1991) (misstatement of law harmless error because court instructed jury that statements and arguments of counsel are not evidence). Here, the trial court did both. Besides correctly instructing the jury that it could consider any mitigating circumstances found from the evidence, the court instructed the jury that the arguments of counsel are not evidence.

-11-

In a related argument, Lingar challenges his attorney's failure to investigate and discover mitigating evidence of his acute paranoid disorder, anxiety disorder, and dysthymic disorder, and his childhood physical and sexual abuse. Lingar also attacks his trial attorney's decision not to present evidence that counsel knew of at the time of trial, including Lingar's borderline intellectual functioning, his history of and treatment for blackouts, dizziness, and severe headaches, and his history of alcohol abuse.

We reject Lingar's contention that counsel failed to conduct a reasonable investigation into his mental and medical health, background, and character. See Jones v. Delo, 56 F.3d 878, 885 (8th Cir. 1995); Sidebottom, 46 F.3d at 752-54. Before Lingar's trial, defense counsel sought a court-ordered mental examination, and the trial court granted one. At a state hospital, Lingar was evaluated by two psychiatrists, a ward physician, a clinical psychologist, a social worker, and psychiatric nursing staff. Lingar had no history of mental abnormality. His score on the Wechsler Adult Intelligence Scale--Revised indicated a "borderline range of intellectual functioning with a full-scale I.Q. also in the borderline range." During the interviews, Lingar's intelligence appeared average and testing revealed he could read at the ninth grade level, even though he dropped out of school in tenth grade. Based on the evaluations, the pretrial psychological report found Lingar did not have a mental disease or defect, he had the capacity to understand the proceedings against him and assist in his defense, and he knew and appreciated the nature, quality, and wrongfulness of his conduct and was capable of conforming his conduct to the law. Absent legitimate concerns about Lingar's mental capacity, defense counsel was not required to seek an additional examination. See Jones, 56 F.3d at 885; Sidebottom, 46 F.3d at 752-54. Although prison testing after Lingar's sentencing revealed Lingar was then suffering from acute paranoid disorder, generalized anxiety disorder, dysthymic disorder (chronically depressed mood), and thus had a severe mental disorder, counsel had no reason to suspect any mental abnormality at the time of trial, before the prison testing. As for the physical and sexual abuse, Lingar knew of it but did not share it with counsel. See Strickland, 466 U.S. at 691 (counsel's actions are usually based on information

-12-

supplied by defendant).  Lingar's attorney interviewed Lingar's family, but they did not disclose the abuse either.  At the time of Lingar's trial, defense counsel simply had no reason to suspect or know of any abuse, and his failure to uncover it is not constitutionally deficient performance.

In addition, defense counsel's decision not to present evidence of Lingar's borderline intellectual functioning, blackouts, and alcohol abuse was not professionally unreasonable.  Borderline intellectual functioning indicates an Intelligence Quotient in the 71-84 range, above the range indicating mental retardation.  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 684 (4th ed. 1994) (DSM-IV).  Lingar's interviews indicated his intelligence was average. Although Lingar had experienced blackout spells similar to fainting from the age of eight, Lingar said they ended a year before the murder, and counsel obtained the related medical records and found them unhelpful.  The jury could have viewed Lingar's history of alcohol abuse unfavorably.  Even if counsel had presented the bypassed evidence, we cannot say the jury probably would have acquitted Lingar of first-degree murder or sentenced him to life in prison.

Last, Lingar argues for the first time that he is actually innocent of the death penalty and thus is not procedurally barred from asserting some of his ineffective assistance claims as the State contends.  Lingar acknowledges the case law forecloses this argument.  The actual innocence requirement focuses on "elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." Sawyer v. Whitley, 505 U.S. 333, 347 (1992).  Thus, Lingar must show that no aggravating circumstance existed, or that some other condition of eligibility for the death penalty was not met.  See Nave v. Delo, 62 F.3d 1024, 1033 (8th Cir. 1995). Lingar's allegations of ineffective assistance do not affect his eligibility for the death penalty because they relate to mitigating rather than aggravating factors.  See id.

-13-

Having carefully considered all of Lingar's arguments, we affirm the district court's denial of his petition for a writ of habeas corpus.

HEANEY, Circuit Judge dissenting.

Trial counsel for Stanley D. Lingar was clearly ineffective in telling the jury in the sentencing phase of Lingar's trial that it could only consider statutory mitigating factors. The jury could and should have been given the opportunity consider all mitigating factors, including a history of sexual abuse, substance abuse, and blackouts; a mental evaluation revealing borderline mental retardation, acute paranoid and depressive disorders; expression of remorse; and indications that Lingar was a good candidate for rehabilitation. Lingar was clearly prejudiced by his counsel's failure to develop and present this evidence. There is no reasonable probability that a jury advised of these circumstances would have imposed the death sentence on this 20-year-old, mentally retarded and mentally disturbed young man.

Lingar was charged with first-degree murder. The case went to trial March 12, 1986, and proceeded in two phases. At the guilt phase of the trial, the primary evidence of the events leading up to and including the murder came from the testimony of David Smith as part of his plea agreement entered into with the state. Given that no other person witnessed the crime, the factual account upon which the finding of guilt was predicated was derived almost exclusively from Smith's narrative. During the guilt phase, the defense only presented one witness, one of the hitchhikers, who testified that although clearly drunk, Lingar and Smith were not swerving. Without Lingar's permission, defense counsel conceded during closing arguments that Lingar was guilty of second-degree murder. (See Appellant's Br. at 4.) Counsel's strategy was to rely on the defense of voluntary intoxication in order to negate the deliberation element

-14-

required for a conviction of first-degree murder.[1]  However, voluntary intoxication was only recognized for five years in the state of Missouri from January 1, 1979 to October 1, 1984.  See Mo. Ann. Stat. § 562.076 (West 1999); State v. McGreevey, 832 S.W.2d 929, 931 (Mo. Ct. App.1992) (giving history of statute).  Quite obviously then, the jury was not instructed on voluntary intoxication, and in fact the prosecutor stated that alcohol abuse was not a shield to defendant's conduct.

At the end of the punishment phase of the trial, the jury imposed a death sentence, finding that the murder was outrageously and wantonly vile, horrible or inhuman in that it involved torture or depravity of mind, and that the murder was committed while petitioner was engaged in a kidnapping.  See State v. Lingar, 726 S.W.2d 728, 731 (Mo.1987) (en banc) (citing Mo. Rev. Stat. §§ 565.032.2(7) and (11) (1986)).  Lingar appealed the conviction and sentence to the Supreme Court of Missouri, which affirmed.  See id., cert. denied, 484 U.S. 872 (1987).  Lingar sought post-conviction relief in the circuit court.  This relief was denied and the denial was affirmed by the Missouri Supreme Court.  Lingar v. State, 766 S.W.2d 640 (Mo.1989) (en banc), cert. denied, 493 U.S. 900 (1989).

On October 18, 1989, Lingar filed a pro se petition for habeas relief pursuant to 28 U.S.C. § 2254.  United States District Court Judge Clyde S. Cahill entered an Order Staying Execution of Death Penalty, appointed counsel for Lingar, and granted Lingar's motion to hold proceedings in abeyance pending completion of state habeas corpus proceedings.  On March 3, 1992, Lingar filed a petition for writ of habeas corpus pursuant to Missouri Supreme Court Rule 91.  The Missouri Supreme Court denied the petition in April of 1992.  In June of 1992 Lingar filed a motion with the same court to recall the mandate and the court denied that motion the same month.  In December 1992, Judge Cahill granted Respondent's renewed motion to vacate stay of proceedings

---

[1]During the course of the day in question, Lingar and Smith drank three and a half bottles of wine and thirty-six beers.

and set a briefing schedule. Lingar filed a First-Amended Petition for Writ of Habeas Corpus on March 1, 1993. In June of 1993, the case was transferred to United States District Court Judge Jean C. Hamilton. Lingar asserted eight grounds of error. More than three years later, and without the benefit of an evidentiary hearing, Judge Hamilton found that most of the claims were procedurally defaulted, or in the alternative were meritless, and denied Lingar's remaining claims on the merits. Judge Hamilton filed her Memorandum and Order August 2, 1996.

Lingar filed an application for certificate of appealability in October 1996. In October 1997, the application was granted in part, permitting Lingar to appeal Judge Hamilton's order on two separate grounds, comprising five issues: first, that the trial court violated Eighth and Fourteenth Amendment rights when it admitted during the penalty phase highly prejudicial testimony regarding Lingar's sexual orientation; second, that his counsel was ineffective in: a) admitting during closing argument Lingar's guilt of second-degree murder; b) basing Lingar's defense to the deliberation element of first-degree murder on the obsolete affirmative defense of voluntary intoxication; c) mistakenly informing the jury during the sentencing phase that the jury could not consider nonstatutory mitigating circumstances; and d) failing to properly investigate and present evidence of mitigating circumstances, including psychiatric evidence.

While I concur in the majority's opinion as to the first three grounds, I cannot agree that failure on the part of trial counsel to ascertain and present substantial non-statutory mitigating evidence at the penalty phase of the trial constitutes effective assistance of counsel and therefore respectfully dissent.

In order to establish a claim for ineffective assistance of counsel, Lingar was required to show that his attorney's performance fell below the "range of competence demanded of attorneys in criminal cases," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that such deficient performance caused him to suffer actual prejudice – i.e.

-16-

that but for the ineffective performance, there was a reasonable probability that the jury would not have imposed the death penalty, see id. at 692. I believe that Lingar made such a showing.

During closing argument at the penalty phase, defense counsel stated that the jury instructions "tell you what the law is," and that in considering mitigating circumstances "the defendant is limited to what the statutory mitigating circumstances are. We may have other mitigating circumstances but they are not involved in the statute and we're not allowed to present them." (Trial Tr. at 437-39.) This represents a complete misstatement of the law regarding nonstatutory mitigating circumstances. See Penry v. Lynaugh, 492 U.S. 302, 327-28 (1989) (jury must be permitted to consider any mitigating factors); Hitchcock v. Dugger, 481 U.S. 393, 397 (1987) (vacating death sentence where jury was instructed not to consider nonstatutory mitigating circumstances).

The district court nonetheless ruled that this failure did not constitute prejudice under Strickland since the trial court cured any misapprehension on the part of the jury with its statement that the jurors could consider "any circumstances which [they found] from the evidence in mitigation of punishment." (Appellant's Br. at 35.) The majority's characterization of counsel's misstatement as harmless error is based on the same rationale. See ante, at 11 (citing Griffin v. Delo, 33 F.3d 895, 906 (8th Cir. 1994); Girtman v. Lockhart, 942 F.2d 468, 474 (8th Cir. 1991)). I cannot accept this rationale because the jury had no mitigating evidence to consider. Because of counsel's misunderstanding of the law, he failed to investigate and develop nonstatutory mitigating circumstances including a background of sexual abuse, serious alcohol abuse, a history of blackouts, mental problems, and documented remorse for the crime. I repeat, the fact that the jury was instructed by the court that it could

consider "any circumstances" is beside the point, as defense counsel neither developed nor presented any such evidence.[2]

It is clear that due to ineffective assistance of counsel, the sentencer in this capital case was not allowed to weigh in mitigation several features of defendant's character and circumstances that supported a sentence of less than death. See Eddings v. Oklahoma, 455 U.S. 104, 110, 112 (1993). If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry v. Linaugh, 492 U.S. 302, 319 (1989) (quoting California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

"Even if evidence of a mental condition is not strong enough to convince a jury to accept an insanity or diminished-capacity defense, the evidence might cause that jury not to recommend a sentence of death." Schneider v. Delo, 85 F.3d 335, 340 (8th Cir. 1996) (citing Eddings, 455 U.S. at 113). The circumstances characterizing Lingar's mental capacity compel the conclusion that this is such a case. The case law presents

---

[2]The majority contends that "[c]ontrary to Lingar's selective quotation from defense counsel's closing argument, the record shows Lingar's trial attorney knew he could present nonstatutory mitigating evidence and did so." Ante, at 10. I cannot share this interpretation of trial counsel's closing argument. At no time during the penalty phase did Lingar's counsel present evidence of his client's background of sexual abuse, substance abuse, and blackouts; a mental evaluation revealing borderline mental retardation, acute paranoid and depressive disorders; expressions of remorse; and indications that Lingar was a good candidate for rehabilitation. All he did at the end of his closing argument was remind the jury that Lingar's family had said he was a good boy. This is a far cry from identifying and developing the above-listed evidence.

a spectrum of decisions concerning whether an attorney's failure to present mitigating evidence constitutes ineffective assistance. See Schneider, 85 F.3d at 340-41 (no ineffective assistance for failing to introduce evidence that defendant suffered from an attention-deficit disorder and insomnia); Guinan v. Armontrout, 909 F.2d 1224, 1229 (8th Cir. 1990) (same regarding an anti-social personality disorder); Hill v. Lockhart, 28 F.3d 832, 846-47 (8th Cir. 1994) (ineffective assistance for failing to introduce at penalty phase evidence that defendant suffered from paranoid schizophrenia and reliance upon anti-psychotic drugs); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (same regarding defendant's bipolar disorder). The evidence places Lingar squarely within those cases finding ineffective assistance.

The courts in Schneider and Guinan found that because the defendant's cognitive abilities were "normal," even a constitutionally ineffective failure to order further psychiatric examination or present more detailed testimony did not sufficiently undermine confidence in the outcome to permit a finding of prejudice. Schneider, 85 F.3d at 339-41; Guinan, 909 F.3d at 1229-30. While the defendant in Guinan also had a history of alcohol abuse, he did not suffer from any mental illness. See 909 F.3d at 1230 ("[T]here is simply no evidence . . . that Guinan's mental problems can be characterized as anything more than personality disorders evidenced by violent and inappropriately aggressive behavior."). In Lingar's case, evaluations indicated that he was suffering from a "severe mental disorder" and was borderline retarded. Thus, Guinan and Schneider are distinguishable.

More analogous are the decisions in Antwine and Hill. In Antwine, the court concluded that there was a reasonable probability that the result in the penalty phase of a capital-murder trial would have been different had counsel discovered and developed evidence concerning the defendant's bipolar disorder. 54 F.3d at 1368. However, that case was decided under a previous death-penalty statute, repealed before Lingar's trial, in which the negative vote of one juror would automatically have meant a life sentence. See id.

In <u>Hill</u>, the court initially observed that "[e]vidence of . . . emotional disturbance is typically introduced by defendants in mitigation." 28 F.3d at 844 (quoting <u>Eddings</u>, 455 U.S. at 115)). It then recounted the history of the case, finding that the lawyer's incompetence resulted in the failure to introduce mitigating evidence regarding defendant's history of psychotic episodes; and the fact that during the events charged, defendant had ceased taking medication that had improved his behavior. <u>Id.</u> at 845. Based on the evidence the jury did not have an opportunity to hear, the court concluded that there was a reasonable probability that the jury would have found additional mitigating circumstances and these circumstances would have outweighed aggravating circumstances. <u>See</u> <u>id.</u> at 846.

This case presents a striking parallel. Lingar argues that if his attorney had adequately researched and presented mitigating evidence, the jury would have heard evidence regarding 1) a history of sexual abuse; 2) a history of alcohol abuse; 3) a history of blackouts; 4) that defendant has severe mental problems; 5) that he is a candidate for rehabilitation; and 6) that he had expressed remorse for the crime. (Appellant's Br. at 35.)

Lingar's contention is supported by affidavits indicating that Lingar suffered from sexual abuse at the hands of his cousin from the age of five into his teens. (<u>See</u> Appellant's Br. at 49-50.) The jury also would have heard evidence that Lingar experienced mental dysfunction. A pre-trial examination revealed that Lingar was "borderline" mentally retarded with borderline intellectual functioning and a borderline IQ score. Additionally, a personality inventory administered by the Missouri Department of Corrections revealed the following DSM-III diagnoses: clinical syndromes including acute paranoid disorder,[3] generalized anxiety disorder,[4] and

---

[3]"Acute paranoid disorder" is a psychosis marked by symptoms including delusions, hallucinations, and grossly disorganized behavior. The diagnosis is reserved for situations in which there is insufficient information to make a more particularized

dysthymic disorder;[5] and avoidant personality.[6]  The report concluded that Lingar suffered from "a severe mental disorder" and recommended further professional observation and care.  (See Appellant's Br. at 3.)  The report issued by the doctors responsible for the pre-trial examination should have suggested to his attorney the need for further evaluation, since one of the statutory mitigating circumstances available under Missouri law inquires into whether "the murder . . . was committed while the defendant was under the influence of extreme mental or emotional disturbance."  Rev. Mo. Stat. § 565.032.3(2) (1999).  Given the clear duty of counsel to investigate and provide an adequate psychiatric evaluation of state of mind in order to provide mitigating circumstances, there is no question but that trial counsel's performance at the penalty phase was insufficient within the meaning of Strickland.  The finding that Lingar suffered from a "severe mental disturbance" should have induced counsel to do further investigation and to develop and present mitigating evidence.  Here, trial counsel's performance is directly analogous to that in Hill.

Lingar's circumstances are also parallel to Hill in that the failure to present available mitigating circumstances satisfied the prejudice prong of Strickland analysis.  See 466 U.S. at 694 (prejudice occurs where confidence in outcome is undermined

_____

diagnosis.  See Diagnostic and Statistical Manual of Mental Disorders 211 (3d ed. rev. 1987) ("DSM-III-R").

[4]"Generalized anxiety disorder" is marked by "unrealistic or excessive anxiety and worry about two or more life circumstances."  DSM-III-R, at 251.

[5]"Dysthymic disorder" involves "a chronic disturbance of mood" and is associated with symptoms such as insomnia, low energy, poor self-esteem, poor concentration, and feelings of hopelessness.  It frequently results from a preexisting, chronic, non-mood disorder such as substance dependence.  See DSM-III-R, at 230.

[6]"Avoidant personality" is characterized by a "pervasive pattern of social discomfort, fear of negative evaluation, and timidity."  Generally, such persons have no close friends or confidants.  See DSM-III-R, at 352-53.

such that "but for counsel's unprofessional errors, result of the proceeding would have been different"). Evidence not presented may have led the jury to find the statutory mitigating circumstance, which was submitted, and other mitigating circumstances that may have been submitted if counsel had been aware of the evidence. Lingar argues that there is a reasonable probability that this would have been enough to offset the two aggravating circumstances found by the jury. (Appellant's Br. at 55); see Hill, 28 F.3d at 846. I agree.

Here, as in Hill, the jury in a capital case was deprived of critical information regarding severe mental disorders suffered by the defendant. See 28 F.3d at 845. The Hill court credited an expert lawyer's testimony that "in cases where I could explain to the jury why a crime occurred . . . they were more willing to impose a sentence of life imprisonment than in situations where I could not give any explanation for what happened and they thought the defendant was just mean." Id. at 846. This common-sense observation is equally applicable in the instant case. Had the jury been apprised of Lingar's life circumstances, there exists a reasonable probability that it would have found mitigating circumstances to outweigh aggravating circumstances and therefore would have voted for life imprisonment. Because I cannot in good conscience join in the majority's certainty that this information would have made no difference to the question of whether Stanley David Lingar should be put to death by the state, I respectfully dissent. In my view, we should promptly issue a writ of habeas corpus requiring the state of Missouri to grant Lingar a new trial within 120 days as to the penalty that should be imposed. Failing that, the state should be required to release Lingar.

A true copy.
    Attest.


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.


-22-